ANTHONY P. BROOKLIER (State Bar No. 50198)
Marks & Brooklier
10100 Santa Monica Blvd., Third Floor
Los Angeles, California 90067
Telephone (310) 772-2287
Facsimile (310) 772-2286
Email: marksbrooklier@yahoo.com

Attorney for Defendant
ARMAN SHAROPETROSIAN

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. SA-CR-09-00248(B)-DOC |
| Plaintiff, | **DEFENDANT'S OBJECTIONS TO THE PSR AND POSITION RE: SENTENCING, WITH EXHIBITS** |
| v. | |
| ARMAN SHAROPETROSIAN, | |
| Defendant. | Sentencing Date: December 3, 2012<br>Court: Hon. David O. Carter |

Defendant ARMAN SHAROPETROSIAN, through counsel, hereby and herewith submits his Objections to the Presentence Report and Position with Respect to Sentencing, with Exhibits.

Defendant reserves the opportunity to make additional comments through counsel at the sentencing hearing in this matter.

Date: November 15, 2012                 Respectfully submitted:

                                                          MARKS & BROOKLIER

                                        By          _____/s/_____
                                                          ANTHONY P. BROOKLIER
                                                          Attorney for Defendant
                                                          ARMAN SHAROPETROSIAN

# I.

## INTRODUCTION

On March 16, 2012, Defendant Arman Sharopetrosian, 34, was convicted by court trial of one count of conspiracy to commit bank fraud [in violation of 18 U.S.C. §1349]; four counts of aiding and abetting, in execution of the bank fraud [in violation of 18 U.S.C. §§1344,2]; and seven counts of aggravated identity theft [in violation of 18 U.S.C. §1028A]. The counts of conviction stem from Mr. Sharopetrosian's involvement in the conspiracy in July and August of 2009 while serving a prison term at Avenal State Prison.

As a result of his participation, Mr. Sharopetrosian, who was close to completing a prior ten year state prison sentence at the time of his offense conduct in this case, will undoubtedly be required to serve a significant amount of time in Federal prison. However, his ultimate sentence should be nowhere close to the 316 months recommended by the U.S. Probation Office.[1]  While Mr. Sharopetrosian's conduct was very serious, the fact remains, as was demonstrated at his trial, that his conduct did not result in any actual financial loss to any of the seven victims he attempted to defraud.

In the course of this memorandum, undersigned defense counsel will respond to the advisory Guidelines issues that are set forth in the Presentence Report (hereinafter PSR). Undersigned counsel believes that the applicable Guidelines in this matter should be no higher than Level 23, which at Criminal History Category IV, corresponds to a Guidelines range of 70 to 87 months. Thus, even if this Court were to sentence Mr. Sharopetrosian to the high end of level 23, his total sentence, including the 24 months of additional time to run consecutively for the aggravated identity theft counts, would be 111 months.

Mr. Sharopetrosian's reason for going to trial in the first place was to demonstrate that he was not responsible for any actual loss. He has never claimed overall innocence in this matter. In a statement submitted by Mr. Sharopetrosian to the Probation Officer prior to his presentence interview, the defendant writes (see PSR, Page 14, ¶73):

---

[1] The U.S. Probation Office's total recommended sentence of 316 months is based on 292 months which corresponds to the low end of level 37, Criminal History Category IV, plus an additional 24 months to run consecutively for the aggravated identity theft counts.

1
2
3
4
5
6
7

           In my case…my reason for going to trial was to give the judge
a clear sense of what my case actually entailed and what I did
and did not do. I accept full responsibility for the counts I have
been convicted of but I do not believe that I should be held
responsible for crimes committed by Angus Brown and the
other individuals who were involved in the bank fraud long
before I ever came to Avenal.

8
9

     It is noted that in an effort to conserve the time and resources of both the Court and the Government, Mr. Sharopetrosian opted for a bench trial rather than a jury trial.

10
11
12
13
14

     It is hoped that in reaching a decision in this matter, the Court will consider, among other factors, Mr. Sharopetrosian's harsh and disadvantaged upbringing. He and his family endured poverty and privation in their native Russian Armenia throughout much of this defendant's childhood. A few months after arriving in Southern California in 1994, Mr. Sharopetrosian's father died suddenly of a heart attack and his family was cast into confusion and demoralization from which it has never truly recovered.

15
16
17
18

     In addition, Mr. Sharopetrosian has struggled with serious health problems beginning in 2002 when he underwent two surgeries to repair perforations of his stomach and small intestines. During his time in state prison, the defendant was hospitalized on numerous occasions for stomach spasms, intestinal blockages, and intensive vomiting.

19
20
21
22

     Of particular concern is the psychological state of Mr. Sharopetrosian's mother, co-defendant Vergine Gasparian. Ms. Gasparian, who is 63, never really recovered from her husband's death 17 years ago. If her son were to receive an overly severe prison sentence, Ms. Gasparian, who is already barely able to maintain her stability, will be completely devastated.

23
24
25
26
27
28

     It is further noted that Mr. Sharopetrosian's decision to involve himself in the attempted fraud while serving his state prison sentence at Avenal State Prison, was directly linked to the fact that he became heavily addicted to heroin after being transferred from Centinela State Prison to Avenal in May of 2009. The defendant's CDCR (California Department of Corrections and Rehabilitation) records show that his security level decreased steadily during his years in Centinela. He presumably would have completed his

sentence and been released from custody without further incident were it not for his catastrophically foolish decision to experiment with opiates in the spring of 2009.

Mr. Sharopetrosian is painfully aware that his difficult personal background, his father's untimely death, his heroin dependency, and the fact that he was responsible for no actual loss, cannot excuse or justify the illegal conduct that brings him before this Court. It is hoped, however, that the Court may find these mitigating circumstances to weigh in favor of a reasonable and not overly draconian sentence. A term of imprisonment along the lines recommended by the Probation Office would keep this young man locked up at the taxpayers' expense until he is approaching 60 years old. He will be subject to deportation once he completes his term of custody, and, no matter what sentence he ultimately receives, he will be repatriated to Armenia where he will no longer pose any threat to the United States or its citizens.

On these grounds, it is submitted that a sentence of anywhere from 8 to 10 years would be reasonable and just. A sentence in this vicinity would send a strong message that financial crimes of this type are not to be tolerated, while allowing this chastened individual some hope of rebuilding his life in another country while he still possesses the health and vitality to do so. A sentence along the lines of the one being requested would be amply retributive but also humane, and would be "sufficient, but not greater than necessary" to satisfy the sentencing criteria set forth at 18 U.S.C. §3553(a).

## II.

### ACCEPTANCE OF RESPONSIBILITY

Defendant Arman Sharopetrosian is deeply contrite at having involved himself in the bank fraud that brings him before this Court. He further regrets that he involved his wife and mother. In a statement provided to the U.S. Probation Officer, Mr. Sharopetrosian writes:

> I accept complete responsibility for my offense conduct. I am
> fully and painfully aware that I have made some serious
> mistakes. I had no business or right to perpetrate the bank
> fraud and other offenses while I was incarcerated at Avenal
> State Prison. I deeply regret having broken the law and I am
> especially upset with myself for having involved my family.

I am painfully aware that I will be sentenced to a lengthy term of imprisonment. I hope, however, that for the sake of my family and especially my heartbroken mother, my imprisonment will not be any longer than is absolutely necessary.

### III.

### UNDER THE ADVISORY GUIDELINES THE DEFENDANT'S TOTAL OFFENSE LEVEL SHOULD BE NO HIGHER THAN LEVEL 23

In the Presentence Report (hereinafter PSR), the U.S. Probation Office arrives at a total offense level of 37, which, at Criminal History Category IV, equates to a range of 292 to 365 months. The Probation Office's calculations are derived from a base offense level of 7 [U.S.S.G. §2B1.1(a)(1)]; an 18-level enhancement for actual and intended loss [U.S.S.G. §2B1.1(b)(1)(J)]; a 4-level increase for 50 or more victims [U.S.S.G. §2B1.1(b)(2)(B)]; a 2-level increase for sophisticated means [U.S.S.G. §2B1.1(b)(10)(C)]; a 2-level increase for vulnerable victims [U.S.S.G. §3A1.1(b)(1)]; and a 4-level aggravated role enhancement for leader/organizer [U.S.S.G. §3B1.1(a)].

Mr. Sharopetrosian, through counsel, respectfully disagrees with most of the Probation Office's guideline calculations. As will be set forth below, the loss enhancement should be no more than 8-levels and there should be no increase under §2B1.1(b)(2) for the number of victims because Mr. Sharopetrosian attempted to defraud no more than seven identifiable individuals. If the Court chose to adopt this approach, Mr. Sharopetrosian's total offense level would be 22 or 23, which at Criminal History Category IV, corresponds to a guideline range of 63 to 78 months or, alternatively, 70 to 87 months. Thus, even with the additional 24 months consecutive for aggravated identity theft, the defendant's total sentence would be in the eight to ten year range.

A.   *Defendant Sharopetrosian's Loss Enhancement Should Be No More Than Eight Levels*

Based on the evidence that emerged at trial, it is clear that Mr. Sharopetrosian's actions and the actions of the co-conspirators *whom he recruited or directed* did not result in any actual loss. (Although the Probation Office states that Mr. Sharopetrosian should be

held responsible for $1,565,576.33 in actual loss suffered by unnamed victims of the overall conspiracy between July 1, 2009 and April 18, 2010, the Probation Office provides no details as to which victims actually lost money, what their losses amounted to, and whether Mr. Sharopetrosian and/or the co-defendants under his supervision made any attempt to defraud them (see PSR, Page 13, ¶69).)

The evidence set forth at trial relating to Mr. Sharopetrosian's offense conduct reveals that he engaged in fraudulent acts beginning on July 22, 2009 and continuing until August 31, 2009. None of these acts on his part, as set forth below, resulted in any actual loss to the seven victims whose identities he unlawfully obtained.

**On or about July 22, 2009**, Mr. Sharopetrosian and co-conspirators attempted to defraud Victim O.B. Victim O.B. had approximately $200,000 in his Chase Bank account. At trial, Victim O.B.'s son testified that O.B. did not lose any actual money.

**During the period beginning on or about July 27, 2009 and continuing through August 13, 2009**, Mr. Sharopetrosian and co-conspirators attempted to defraud Victim K.K. Although it was claimed that Mr. Sharopetrosian told a co-conspirator that K.K.'s bank account contained over $700,000, in actuality, the trial evidence showed that the account contained around $51,000. A co-conspirator attempted to extract funds from K.K.'s account, but the attempt was unsuccessful and there was no actual loss.

**During the period beginning on or about July 28, 2009 and continuing through August 3, 2009**, Mr. Sharopetrosian and co-conspirators attempted to defraud Victim M.C. whose Bank of America account was believed to contain approximately $108,000. A fraudulent check was written against M.C.'s bank account for $74,000 but the check was stopped by the bank and there was no actual loss.

**During the period beginning on or about August 6, 2009 and continuing through August 7, 2009,** Mr. Sharopetrosian and co-conspirators attempted to defraud victim J.L. While it is unclear how much money was in J.L's Citibank account, Mr. Sharopetrosian and his co-conspirators attempted to negotiate a fraudulent check of $44,730.17 written against the account. The co-conspirators were arrested with the fraudulent check in their possession. There was no actual loss.

**According to ¶60 of the PSR, on or about August 13, 2009**, Mr. Sharopetrosian and a co-conspirator attempted to forge checks written against an unidentified bank

1 account which allegedly contained about $436,000. It appears that this account may have
2 never existed. In any event, there was no actual loss and Mr. Sharopetrosian was not
3 convicted for this count.

4 **During the period beginning on or about August 19, 2009 and continuing**
5 **through August 30, 2009**, Mr. Sharopetrosian and one or more co-conspirators discussed
6 defrauding victim N.A. by means of a single check for around $45,000. N.A. had a Bank
7 of America account that was believed to contain approximately $360,000. The attempt to
8 defraud N.A. was unsuccessful and she testified at trial that she sustained no financial loss.

9 **On or about August 20, 2009**, Mr. Sharopetrosian obtained from an unidentified
10 co-conspirator account information concerning victims K.W.K. and H.K.'s Chase bank
11 accounts. The two victims' accounts are believed to have contained approximately
$200,000. Based on the trial testimony, these two victims suffered no actual loss.

12                      *    *    *    *    *

13 At trial, Defendant Sharopetrosian was convicted of seven counts of aggravated
14 identity theft. The trial testimony indicted that none of these seven victims suffered any
15 actual loss. Thus, the defendant should receive no enhancement for *actual* loss under the
16 Guidelines. This leaves the question of *intended* loss to be determined.

17 Though above-referenced seven victims suffered no actual loss, the funds in their
18 bank accounts collectively totaled around $964,000. Thus, the specific offense
19 characteristic for intended loss would be 14 levels, prior to any downward departure or
20 adjustment for the circumstance that Mr. Sharopetrosian realized *no* actual gain and there
was never any chance of that because of the wiretap surveillance.

21 Even before the U.S. Supreme Court held in United States v. Booker, 543 U.S. 220
22 (2005), that the Guidelines would henceforth be advisory rather than mandatory, numerous
23 District Court decisions had held that lack of personal gain on the part of the defendant is a
24 proper basis to depart from a Guidelines level predicated on large loss amounts. E.g.,
25 United States v. Forchette, 220 F.Supp. 2d 914, 926 (E.D. Wis. 2002) (departing downward
26 where defendant reaped "limited gain in comparison to the amount of loss"), United States
27 v. Costello, 16 F.Supp. 2d 36, 38 (D. Mass 1998) (court concluded loss overstated
28 seriousness of the offense where the defendant's profit "was miniscule compared to the"
$20,000,000); United States v. Redemann, 295 F.Supp. 2d 887, 897-98 (E.D. Wis. 2003)

(concluding loss substantially overstated seriousness of offense where "it may well be that defendant realized *no* improper gain based on his involvement" in the scheme, "yet his guideline range was increased based on a loss amount of almost two and one-half million dollars"). United States v. Redemann is particularly on point in this matter inasmuch as Mr. Sharopetrosian clearly "realized *no* improper gain based on his involvement" in the scheme.

Thus, even if this Court was to conclude that Mr. Sharopetrosian should receive a Guidelines enhancement for intended loss, this enhancement should be offset by either a downward departure or adjustment of at least 6 levels because the defendant did not realize any gain and there was never risk of financial loss to the victims due to the wiretap surveillance.

The Probation Office's contention that Mr. Sharopetrosian should be held responsible for $1,565,576.33 of actual loss and $3,247,445.98 of intended loss is not supported by the evidence adduced at trial. Mr. Sharopetrosian's part of the scheme was limited in nature. He should not be held responsible for financial losses suffered by other victims who were defrauded by other members of the conspiracy separate and apart from him. Nor should he be held responsible for intended loss related to the actions of the other conspirators in whose machinations he played no part.

In this instance, the 10-level difference between an 18-level enhancement (as the PSR proposes) and a 8-level enhancement for loss amount (as the defense requests) produces a vast difference in the ultimate guideline calculations. Ninth Circuit case law has long held that the amount the Court determines as a guideline loss figure must be supported by reliable evidence. In making a sentencing calculation, a court "may not...adopt conclusory statements [from the PSR] unsupported by facts of the Guidelines" United States v. Rosacker, 314 F.3d 422, 426 (9th Cir. 2002) (quoting United States v. Navarro, 979 F.2d 786, 789 (9th Cir. 1992)). Since the constitutional guarantee of due process applies at sentencing (Gardner v. Florida 430 U.S. 349, 358 (1977)), a sentencing court may violate a defendant's due process rights if it relies on unreliable information at sentencing. United States v. Kerr, 876 F.2d 1440, 1445 (9th Cir. 1989) (citing United States v. Ruster, 712 F.2d 409, 412 (9th Cir. 1983)). A court's reliance on unsupportable or speculative information may constitute an abuse of discretion. United States v. Petty,

1   982 F.2d 1365, 1369 (9th Cir.), amended on denial of rehearing, 992 F. 2d 1015 (1993),

2   cert. denied, 510 U.S. 1040 (1994).

3       Adopting the 18-level loss increase based on the "conclusory" statements in the PSR

4   would run afoul of United States v. Rosacker and its sister cases. And, as set forth above,

5   given that Mr. Sharopetrosian and his co-conspirators were under wiretap surveillance right

6   from the inception of his involvement, there was never a risk of any actual loss occurring.

7       Relying on the Ninth Circuit decision in United States v. Staten, 450 F.3d 384 (9th

8   Cir. 2006), it is well-settled that enhancements that cause a disproportionate impact on

9   sentences must be established by clear and convincing evidence, even under the now

10  advisory guidelines. See also United States v. Peyton, 353 F.3d 1080, 1088 (9th Cir. 2003)

11  ("the application of the preponderance of evidence standard, as opposed to the clear and

12  convincing standard, violates due process rights only if it leads to enhancements that have

13  an 'extremely disproportionate effect on the sentence relative to the offense of conviction'")

14  (quoting United States v. Mezas de Jesus, 217 F.3d 638, 642 (9th Cir. 2000)); United States

v. Jordan, 256 F.3d 922, 927-29 (9th Cir. 2001). The Staten Court sets forth:

>               In short, neither the holdings nor the reasoning of our prior case
>               law concerning heightened burdens of proof at sentencing are
>               irreconcilable with Booker. We hold, accordingly, that this
>               circuit's established rule, requiring facts found in support of the
>               Guidelines enhancements that turn out to have a
>               disproportionate impact on the ultimate sentence imposed to be
>               established by clear and convincing evidence, continues to
>               govern sentencing decisions.

22      A disproportionate impact on sentencing occurs when an enhancement increases a

23  defendant's guidelines by more than four levels or, alternatively, results in a sentence that

24  more than doubles what would otherwise be the applicable guideline sentence. In this case,

25  applying an 18-level offense characteristic for loss would lead to an enormous overall

26  increase that would at least double Mr. Sharopetrosian's sentencing exposure, and thus run

27  counter to Staten.

28      For the above reasons, it appears that a balanced approach to loss amount would

encompass an 8-level specific offense characteristic – arrived at through an initial 14-level

enhancement for intended loss, followed by a 6-level downward departure since there was no actual loss and Mr. Sharopetrosian realized no financial gain from his involvement.

B. *The 4-Level Increase for Number of Victims Recommended in the PSR Is Without Merit and Should Not Be Applied*

The PSR (at ¶¶82 -83) recommends that Mr. Sharopetrosian receive a 4-level enhancement based on 114 victims in total, whose means of identification were used unlawfully or without authority. Yet, in describing the offense conduct attributed to Mr. Sharopetrosian, the Probation Officer only ties him to the seven victims who correspond to the seven aggravated identity counts. The PSR does not connect Mr. Sharopetrosian to any of the other victims. Nor does it state who the other victims were and whether they lost any money. The lack of any evidence connecting Mr. Sharopetrosian to the other victims is telling and suggests that the PSR's analysis is highly "conclusory" and would be violative of United States v. Rosacker and its sister cases were it to be adopted by this Court.

It is further noted that the "loss" and "number of victims" issues are integrally related. The fact that Mr. Sharopetrosian's actions caused no actual loss and that the intended loss was less than $1 million results from the relatively small number of victims that he attempted to defraud. Just as the defendant's sentencing exposure should not be increased for loss or intended loss derived from victims with whom he had no connection, his exposure should likewise not be increased for victims he had no knowledge of and made no attempt to defraud.

Based on the Staten case and its progeny that have been discussed above, it is well-settled that enhancements causing a disproportionate impact on sentences must be established by clear and convincing evidence. Eliminating any enhancement for number of victims and applying an 8-level total enhancement for loss amount would result in a total offense level of 23 with corresponding guidelines at Category IV of 70 to 87 months. On the other hand, the application of the Probation Office's recommended guidelines would result in a sentencing range, at Category IV, of 292 to 365 months. Therefore, the unwarranted enhancements recommended by Probation would *quadruple* the defendant's sentencing exposure and would clearly violate Staten's mandate that enhancements that

cause a disproportionate impact on sentences must be established by clear and convincing evidence.

C.    *Further Guideline Enhancements and Adjustments*

Defendant Sharopetrosian concedes that the "sophisticated means" enhancement [U.S.S.G. §2B1.1(b)(10)(C)] should apply in this instance (see PSR, Page 16-17, ¶¶84-86). Although the defendant's participation occurred over a fairly short period of time and was focused on a relatively small number of victims, he was aware of at least some of the intricate methods utilized in carrying out the scheme which would trigger this 2-level specific offense characteristic.

Mr. Sharopetrosian also does not object to application of the 2-level "vulnerable victims" enhancement [U.S.S.G. §3A1.1(b)(1)(C)]. He concedes that he knew or should have known that some of the targeted victims were elderly or otherwise vulnerable.

Finally, Mr. Sharopetrosian does not object to the application of either a 3 or 4-level aggravated role enhancement. Based on the evidence at trial, he directed or supervised the activities of various co-conspirators. Whether his involvement should qualify for the 4-level organizer/leader enhancement or the 3-level manager/supervisor enhancement is a close call. Inasmuch as the Court was present at the trials of Mr. Sharopetrosian and his co-defendants, the Court would appear to be in the best position to make this determination.

D.    *Defendant's Recommended Guideline Calculation*

Based on the above discussion, Defendant Sharopetrosian, through counsel, respectfully requests that the Court adopt the following advisory Guideline calculations:

| | |
|---|---|
| Base Offense Level, §2B1.1(a)(1) | 7 |
| Increase for Intended Loss, §2B1.1(b)(1)(J) | 14 |
| Downward Departure to Loss Amount Due to | -6 |
| Lack of Personal Gain | |
| Sophisticated Means, §2B1.1(b)(10)(C) | 2 |
| Vulnerable Victims, §3A1.1(b)(1) | 2 |
| Aggravated Role, §3B1.1(b) or (a) | 3 or 4 |
| **Total Offense Level** | 22 or 23 |
| Criminal History Category | IV |
| Advisory Sentencing Range | 63 to 78 months or |

70 to 87 months

## IV.

## DEFENDANT'S HISTORY AND CHARACTERISTICS

## SUPPORT THE REQUESTED SENTENCE OF 96 TO 120 MONTHS

Following Booker and Gall v. United States, 128 S.Ct. 586 (2007), it is well-established that the history and characteristics of the defendant should be weighed in arriving at an appropriate sentence [see 18 U.S.C. §3553(a)(1)].[2] It is also established law that a non-guidelines sentence is in no way presumptively unreasonable and that a District Court judge's sentencing decision should be based on all of the sentencing factors set forth at 18 U.S.C. §3553(a). The advisory guidelines are only one of the factors and should not be given undue weight.

The following social history information is presented to the Court in the spirit of 18 U.S.C. §3661 which states that "no limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

A.      *Family Background*

Arman Sharopetrosian is one of two sons of Hovannes Sharopetrosian and Vergine Gasparian. Hovannes was born in 1948 in Yerevan in what was then Soviet Armenia. His father was a master jeweler and Hovannes began working at the Tangarzek jewelry factory in Yerevan when he was 16. After completing high school, Hovannes attended the Institute of Railroad Engineering and received his Bachelor's degree in 1970. Salaries for engineers were extremely low at that time and after graduation, Hovannes continued to work in the jewelry factory where, in time, he became a skilled and respected jewelry designer.

---

[2] Two other United States Supreme Court decisions, Spears v. United States, 129 S.Ct. 840 (2009), and Nelson v. United States, 129 S.Ct. 890 (2009), have reiterated that the Guidelines are now truly advisory and that there is no presumption at the District Court level that a Guideline sentence is inherently reasonable. See also Rita v. United States, 127 S.Ct. 2456 (2007), and United States v. Tomko, 562 F.3d 558 (2009).

Arman's mother Vergine Gasparian was also born in Yerevan in 1948. She and Hovannes met in elementary school in the first grade and went all the way through school together. Vergine attended music school in the afternoon after her regular school day ended and became an accomplished piano player. She and Hovannes remained friends all the way through school and later fell in love. Following high school, Vergine studied languages and earned her teaching degree. She and Hovannes were married in 1970.

Vergine gave birth to Arman's older brother Michael Sharopetrosian in 1973. Michael currently resides in Yerevan where he works as a caregiver.

**B.    Early Childhood**

Arman was born in Yerevan on July 9, 1978. He recalls that his early years in Yerevan were secure. Although he was diagnosed with a congenital heart murmur, it was not thought to be serious and was expected to diminish with time. He recalls that his parents were loving and attentive and that he was very close to his maternal grandmother Satenik Miridjanian. Arman started kindergarten at age four. Once he was in school, his mother Vergine began teaching English in the Yerevan public school system. Between her salary and Arman's father's wages at the jewelry factory, the Sharopetrosians were able to pay their bills and keep food on the table.

Arman's mother Vergine Gasparian sums up in her letter:

> I was a teacher in Yerevan, Armenia. I worked in the same
> high school #83 for 15 years… I loved my job and liked to
> work with children. I gave them all my heart and knowledge I
> had.

Arman matriculated at Public School #83 when he was six. He recalls doing generally well scholastically and excelling in math and science. He received private tutoring after school and was diligent in completing his homework.

**C.    Fall of the Soviet Union**

The Soviet Union crumbled in the late 1980s. Although Soviet communism was dead, its legacy lived on and the new Armenian government was both corrupt and incompetent. This, combined with a catastrophic earthquake that struck Yerevan and the surrounding area in 1988, devastated the local economy. Hovannes lost his position at the jewelry factory and was reduced to taking occasional small, private jobs. Due to the

cutbacks, the school year was reduced to five months which reduced Vergine's salary by 50 per cent. In an interview conducted in preparation of this memorandum, Arman described:

> These were tough times for the entire city. There was no hot water and electricity was only available one or two hours a day. We lived in a house on a hilltop above a forest and a lake. Our only source of heat was a portable cast iron stove. When I wasn't in school, every day I would head down into the forest with a saw and axe. All morning I would chop wood and in the afternoon I would saw it into three foot lengths and carry it up the hill to our house.

In her letter, Arman's mother Vergine describes:

> Economic situation in Armenia was very bad from 1988-1995 after independence from Soviet Union. There was no electricity no gas. The winters in Armenia are very cold. From early morning Arman was in the forest which was near our house to cut and bring wood to burn and get warm in our house. The scars of the axe are still in his hands.

D.    *Move to the United States/Death of the Defendant's Father*

From 1988 until 1994, the Sharopetrosians lived at the edge of poverty. Arman's father Hovannes had visited the United States once in 1976, and in January of 1994, he was offered a job with a jewelry design company in Los Angeles. This was a dream come true for Hovannes and in February he brought his family to Southern California on a business visa. Arman recalls in his letter to the Court:

> My father started work one week after we arrived. We were still living with my aunt in Hollywood, and after 20 days we rented an apartment and moved to Glendale city.
>
> I started high school at Hoover High School, my brother Michael started going to college, and my mom Vergine was studying for her exams to get her diploma so she can start

working as a teacher... My grandparents came after a few
months and we all were living in a big house, like back in
Armenia. I always had good grades in school, and my father
always kept asking me to become somebody and I can only do
so through education and learning. He used to say that he
doesn't care if he has to work 24 hours a day to provide to our
family. As long as me and my brother learned and did good in
school...

...every day my brother came to pick me up from school at
3:00 p.m. and we drove to downtown L.A. to pick up my father.
My father has 3 sisters in the United States. We always on the
weekends get invited to somebody's house or wedding, and I
always went with them. My brother is 5 years older than me
and at that time he was 21 years old, so I was the only one who
got to go everywhere with my parents.

The Sharopetrosians initially made a good adjustment to life in California. They
were very glad to be here after years of hardship in Yerevan and the future looked bright.

On the night of January 8, 1995, Arman's father Hovannes died of a heart attack.
Arman had not been with the family that day because he was attending his cousin's
birthday party. He recounts in his letter:

In the morning my brother came in the room...and sat down on
the bed and told me that my father had passed away last night
from a heart attack and started crying. My father was only 44
years old. My family only let me go to my father's wake, and
the next day when they buried him, my family didn't let me go
see my father get put in the ground... they brought mom home
in a really bad condition. She keeps losing consciousness and I
just didn't know what happened and what hit us. Our whole
world changed.

1    Arman stayed home for a week.  Throughout this time his mother was often *non*
2    *compos mentis*.  When Arman went back to school he got into an argument with another
3    Armenian student and was suspended for three days.  His letter continues:

4         When I come home my mom was crying and my relatives were
5         home, so I decided not to tell my mom what happened in school.
6         So the next morning I got up as usual and went to school to my
7         first period class which was English class and started taking my
8         quarterly exam.  Twenty minutes later I was called to the
9         principal's office and school police officer Anthony Fiusha
10        arrested me for trespassing.  My mom came and picked me up
11        from the police station a couple hours later and was crying even
12        harder and telling me that only a week ago we buried your father,
13        why are you doing this to our family.  She told me that we don't
14        have anybody to take care of us like my father did, and nobody
          cares what happens to us.

15        In essence, Arman lost both his parents on the same day.  His father was dead and
16   his mother was a shell of her former self.  Arman's maternal grandmother Satenik
17   Miridjanian describes Arman in the days following his father's death:

18        At that time Michael was 20 and Arman was 15 years old.  Our
19        whole family got miserable, my grandchildren lost themselves.
20        Imagine what can happen to young boys when they lose their
21        beloved father forever.  Arman would not come home from the
22        cemetery for days, the fathers death was the hardest on Arman.
23        He was looking for his father every day and everywhere.  My
24        daughter and I [c]ould hardly make him come home from the
          cemetery.  Everything was way too harsh.

25        It was not only the fact of his father's death, but also the way it happened and the
26   young ages of all involved, that produced the immense pall of sadness and trauma from
27   which Arman has yet to emerge.  He writes:

28        …my mom and dad left the restaurant to come home and in the
          parking lot where there car was parked, my dad grabbed his

chest and complained for pain. My mom's secondary sisters are doctors in Armenia so she knew what kind of pain it was, so she told him not to move from that curb that he was sitting on, she will get help.

…they called my relatives who came and took them to their house while my mom kept asking them to take him to an emergency room for a check-up. My relatives told my mom it will cost us a lot of money and we don't have insurance and means to pay. All he needs is to rest until morning, he'll be fine. From the restaurant to their house is only 10 minutes, and after they arrived my father laid down on the bed and started choking. By the time my mom says the emergencies arrived he was already gone.

I never forgave myself for not going with them that day, and kind of always thought that one day my father will open our door again and everything will go back to normal, which turned out the whole opposite of that. …My mother never recovered until this day from losing my father. She couldn't continue her studies, and stayed home and took care of my grandparents. As for me, I went downhill all the way and literally hit rock bottom.

The loss of any loved one is always difficult. After Hovannes' death, Arman's entire family fell into serious depression. Although Arman was reeling, he tried to be supportive toward his mother. Vergine Gasparian relates:

My husband passed away in 1995 after 10 months of our arrival to the United States. Arman was only 16 years old. After losing my beloved husband my life was changed totally. I fell into deep depression and went through a lot of difficulties. I had to take care of my sons and elderly parents. My father had

lymphoma and my mother had stroke.  During all those years Arman was a great support to me.

My father's battle with lymphoma took 4 years, he passed away in November 1999.  All these 4 years, every week I took my father to doctor's appointments with the help of Arman.

Unquestionably Arman has clearly made serious mistakes which are reflected in his rap sheet and the years he has spent incarcerated.  Yet, according to family members and friends, he has always been a kind and supportive person in his everyday interactions with others.  His older brother Michael Sharopetrosian writes:

Your Honor, Arman is a very carrying person, very intelligent, and a loving husband.  All this time I have known him, he was a nice guy, he would help everyone around him, and he would help the older neighbors to carry their shopping bags, help them in their backyards.  After coming to US he worked at a jewelry factory, later messenger service, and then at La-Romano tailors.  Every one of his superiors was extremely happy to work with him.  He would always protect younger kids in school from bullies, and being so heartbroken after our father passed away, he would still be nice to everyone else.

Arman's sister-in-law Zhanna Grigoryan adds:

While I was living with my husband's family, I got to know Arman.  I have to say that he is a very kind and loving person.  He was very nice to me; he was always ready to help me when my husband wasn't around.  I liked him very much too, we were just like brother and sister and the fact that I was being loved in that family seemed like I've always been a part of it.

E.   _Work History_

Not long after Arman left school, at his mother's request, a family friend and jeweler named Karen Markosian (who is a co-defendant in this case) agreed to provide Arman with training at his downtown Los Angeles jewelry business.  Over the next four or five months,

Mr. Markosian taught Arman how to do settings for rings, earrings and bracelets. Arman Sharopetrosian then spent another five months learning modern jewelry techniques at a separate downtown Los Angeles location. Arman also worked at a grocery store in Glendale and at United Express delivering packages. After six months with United Express, he found a position with K & M Jewelry at 7th and Broadway in downtown Los Angeles. In 2000, Arman Sharopetrosian and his brother Michael started a delivery service that provided snacks and snack racks to service stations. This business was up and running for approximately one year. Arman Sharopetrosian was employed fairly consistently from age 17 to 24, when he developed serious health problems.

F.    *Medical History*

While engaging in physical fitness training in Yerevan when he was 8, Arman was struck in the nose with a ball which permanently affected his breathing. The problem was eventually diagnosed as a deviated septum which was repaired through surgical resection at Glendale Memorial Hospital when he was 20.

Arman's breathing problem was minor compared to the abdominal problems that arose in his early 20s. In February of 2002, he experienced acute abdominal pain and returned to Glendale Memorial Hospital. During an exploratory laparotomy, a perforated duodenal ulcer was discovered. The ulcer had resulted in gastric juices and other foreign materials accumulating in Arman's abdomen. The surgeons repaired his duodenum, cleaned out the waste materials, and removed his appendix which appeared to be inflamed. Arman was released one week after the surgery again.

Two days after his release complications arose and Arman, who was experiencing acute discomfort and vomiting, returned to the hospital. A second exploratory laparotomy was performed. This time numerous adhesions were discovered in various parts of his abdomen along with small bowel obstruction that caused massive bowel distention. In effect, Arman's small intestine had tied itself in knots and was strangling itself. In the surgeon's report (appended at Exhibit C), David G. Davtyan, M.D., describes:

> Massively distended multiple loops of small bowel
> immediately pushed through the abdominal wound and were
> allowed to "pop out" through the incision to relieve the tension
> that had built inside. The small bowel was evaluated and

> several areas of very dense, fleshy bands of adhesions were
> identified... This was [a] truly spectacular demonstration of
> early postoperative adhesions completely obstructing and
> strangulating the small bowel.

The surgeons cut away the adhesions, cleaned out Arman's intestines, and removed substantial portions of his small intestine before re-stapling it. He was released from the hospital a few days later.

Although Arman's conditioned stabilized temporarily following the second surgery, for the next five or six years he experienced frequent stomach spasms and vomiting which were caused by his small intestine shutting down. This resulted in numerous hospitalizations during Arman's stint in state prison, several of which were in Pioneer Memorial Hospital in Brawley, California.

G.    *State Prison/Drug Addiction*

The unanticipated death of his father when he was 15, combined with his mother's ensuing deep chronic depression, had a very deleterious effect on Arman. He lost hope, lost any sense of joy, began to act out, and drifted inexorably into the illegal behavior that eventually landed him in state prison for a multi-year sentence.

Arman was received at the California Department of Corrections and Rehabilitation (CDCR) on August 16, 2004 (see PSR, Page 24, ¶120). After going through the CDCR classification process, he was designated to Centinela, a Level III facility, in May of 2005 with a classification score of 45. Over the next four years, Arman's family visited him regularly and, with their support, he appeared to make an adequate adjustment to prison life. Arman's mother Vergine Gasparian writes:

> In 2002 Arman had two big surgeries on his stomach and
> bowels. In 2003 he went to prison and the recovery period he
> spent there. Every week we all went to visit him, although my
> mother had stroke and was in the wheelchair and my
> granddaughters were newborn. All the members of visiting
> staff in Sentinella State Prison knew us. They were very kind
> to us. All the...years in Sentinella State prison he behaved
> himself very well.

During this period, Arman also received regular visits from his wife, co-defendant Kristine Ogandzhanyan, whom he had married in 2004 while in county custody.

His brother Michael Sharopetrosian writes:

> Visiting him in prison was the hardest thing knowing that it was going to be a part of our life for the next 10 years. We were trying to visit him as often as possible to make sure he does not feel abandoned and lonely. He was transferred to Centinela state prison in Imperial, CA. He spent almost four years in there and never had any problems. He had an excellent behavior and a great relationship with the correctional officers…

In his own letter, Arman recalls:

> When I started doing time, I got visits every weekend from my whole family. My grandmother is 84 years old. She used to come visit me once a month. She would get up at 5:00 a.m. in the morning and wake everybody up in the house…

Arman's positive direction while housed at Centinela is demonstrated by his steadily improving Classification scores. By September of 2006, his score had decreased from 45 to 35. In August of 2007, his score was calculated at 27 and in April of 2009 it was further reduced to 23. This led to his transfer to Avenal State Prison, a Level II facility, in the spring of 2009.[3]

Shortly before his transfer from Centinela to Avenal, Arman, who had remained drug free throughout his time in custody, made the fatal mistake of trying heroin. He writes to the Court:

> In March of 2009, I tried heroin for the first time in my life and that is what ruined my life completely. I can truly say from the foundation to the top I became a completely different person. I gave them a drug test in April of 2009 before transferring to a lower level facility and tested positive for heroin. When I

---

[3] Mr. Sharopetrosian's state prison records are appended at Exhibit D.

arrived at Avenal…I had the disciplinary 115 follow me from
Centinela…and got my visits taken away for six months and
random drug testing for one year.  During that time [the] yard I
was on was locked down so I started getting my drugs from
African Americans, started refusing my random testing, and
soon got hooked on methamphetamine too.  Mixing them
together, in total I got 22 write-ups and ended up in a ADSEG
unit before transferring to Salinas Valley State Prison.  There
was a lieutenant named Navarro, a very good man, God bless
his heart, who saved my life and helped me clean up when he
took me off that prison yard and put me in ADSEG unit to
clean up.  I haven't used anything since March 14, 2010.

As a direct consequence of his heroin addiction, Arman involved himself in the
instant conduct as a desperate attempt to try to pay his debt to the heroin suppliers at his
prison.  Had he not been placed in Administrative Segregation in the spring of 2010, he
likely would have been stabbed or severely beaten, or perhaps killed, for failure to pay his
drug debt.

Arman is fully aware that his narcotics dependency and the debts it created while he
was in Avenal cannot excuse or justify his participation in the fraudulent conduct for which
he faces sentencing.

He writes:

My mother never knew about this drug addiction of mine.
She's very embarrassed about it.  Your Honor, that is the
reason I went to trial so you guys could hear my
voice…because I'm disgustingly loaded out of my mind and
talking like I'm a crazy maniac…  That's why I didn't want my
mom in the courtroom to listen to my stupidity.  I'm sorry to
put you guys through it…  And last and more importantly, I
just wanted Your Honor to hear and see that my mom and my
wife are not professional crooks.  They just did what their

stupid son and husband, drugged out of his mind, asked them to do.

## V.

## THE REQUESTED SENTENCE IS IN CONFORMANCE
## WITH THE CURRENT STATE OF THE LAW

Under the principles set forth in <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are purely advisory. The Guidelines are now just one among a number of factors that sentencing courts are directed to assess in imposing a sentencing that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). These purposes consist of retribution, deterrence, incapacitation and rehabilitation. In determining the sentence minimally sufficient to comply with or meet these aims, a sentencing court is also instructed to consider additional factors listed in §3553(a), including:

> The nature and circumstances of the offense, and the history and characteristics of the defendant; the kinds of sentence available; the need to avoid unwarranted sentencing disparity; the need of a defendant for correctional or vocational treatment; and restitution, where applicable.

Neither §3553(a) nor <u>Booker</u> suggests that any of these circumstances is individually paramount. All of these factors, however, are controlled by §3553(a)'s mandate to impose a sentence "sufficient but not greater than necessary" to comply with the purposes of sentencing.

Numerous appellate decisions from various circuit courts have clarified the role and approach of the sentencing court in the post-<u>Booker</u> era. The Ninth Circuit has held that "<u>Booker</u> empowered district courts, not appellate courts.... [and] breathe[d] life into the authority of district court judges to engage in individualized sentencing." <u>United States v. Whitehead</u>, 532 F.3d 991, 993 (9th Cir. 2008) (citations omitted).

The Sixth Circuit has stated: "Many times we have emphasized that a district court's mandate is to impose a sentence sufficient, but not greater than necessary to comply with the purpose set forth in § 3553(a)(2)." <u>United States v. Yopp</u>, 453 F3d 770, 773 (6th Cir. 2006). The Sixth Circuit has further described the role of the sentencing court as follows:

"[A] district court's job is not to impose a 'reasonable' sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2). Reasonableness is the *appellate* standard of review in judging whether a district court has accomplished its task." United States v. Foreman, 436 F.3d 638, 644 n.1 (6th Cir. 2006). Furthermore, the Ninth Circuit has stated that in weighing the sentencing decisions of a district court, the proper standard is abuse of discretion, and it will not "second guess" the court's conclusions so long as they are reasonable. United States v. Menyweather, 447 F.3d 625, 633 (9th Cir. 2006).

Finally, the Seventh Circuit has stated that post-Rita "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence." United States. v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007).

Thus, in determining whether to honor Defendant Sharopetrosian's request for a term of imprisonment in the 96 to 120 month range, this Court is respectfully requested to base its decision on the totality of the factors present in this case. These factors in combination strongly suggest that a sentence in this range "would be sufficient but not greater than necessary" to comply with the sentencing factors set forth at 18 U.S.C. §3553(a)(2).

## VI.

### THE TOTALITY OF THE FACTORS
### SUPPORT A SENTENCE OF 96 TO 120 MONTHS

It is always a sad thing to see a defendant's life reduced to a state of abject hopelessness. In this instance, Defendant Arman Sharopetrosian's life has hit rock-bottom. It also goes without saying that his criminal conduct was serious and inescapably carries consequences for Arman and requires punishment.

It is submitted, however, that since his involvement resulted in no actual loss to the seven victims he attempted to defraud, a sentence in the vicinity of 8 to 10 years would be sufficient to effectuate justice in this matter. Upon finishing his time in custody, Mr. Sharopetrosian will be deported to his native Armenia. Reducing this defendant's sentence from the truly staggering number of months proposed by the Probation Office to the more

reasonable term of imprisonment requested by Defendant Sharopetrosian would be beneficial for several reasons. First, it would enable this man who has struggled with both physical and emotional health issues to begin rebuilding his life in Armenia by about the time of his 45th birthday. On the other hand, if he was to receive a sentence similar to that recommended by Probation, he would be in his very late 50s by the time he was deported, and would have little hope of ever putting his life back together.

If the defendant were to receive a sentence even approximating that recommended by Probation, it would break his mother Vergine Gasparian's heart and it is highly questionable that she would survive to see his release from custody. The suffering Ms. Gasparian has already endured, beginning with the difficulties her family experienced in post- Soviet Armenia has been monumental. Although she has done her best to stay strong, she clearly has never recovered from her husband's death.

In addition, there is the simple matter of economics. The cost of housing federal inmates in good health typically runs upwards of $30,000 to $35,000 a year. Given Mr. Sharopetrosian's long-term chronic health problems, it is not unreasonable to posit that, if held in Federal custody for the next couple of decades, he could end up costing the system hundreds of thousands or even millions of dollars for health care, in addition to the normal costs of housing inmates. Given that he will be deported upon his release from custody, it simply does not make sense for the American taxpayer to foot the bill to house this defendant in U.S. Federal custody for any longer than is absolutely necessary to achieve deterrence, societal protection, and just desserts.

The requested sentence of 8 to 10 years cannot reasonably be construed as overly lenient, for the simple reason that Mr. Sharopetrosian was not directly responsible for any monetary loss. Furthermore, it is undisputed that this young man's history of legal problems stems at least in part from his father's tragic death and his mother's inability to provide adequate guidance in the aftermath. These factors, combined with his severe heroin addiction and mounting debt when he became enmeshed in the instant conduct, militate toward a reasonable sentence of not more than 10 years. Such a result would effectuate justice in this matter while not unduly straining the Bureau of Prison's limited resources and allowing Arman Sharopetrosian and his family some modicum of hope for his future.

1

## VII.

2

### CONCLUSION

3    On the above grounds, Defendant Sharopetrosian, through counsel, respectfully

4  requests a sentence of not less than 8 years and no more than 10 years in Federal custody.

5  Date: November 15, 2012                    Respectfully submitted:

6

7                                             MARKS & BROOKLIER

8                                 By    _____/s/_____

9                                             ANTHONY P. BROOKLIER

10                                            Attorney for Defendant
                                             ARMAN SHAROPETROSIAN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28