ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
E. MARTIN ESTRADA (Cal. SBN: 223802)
JOSEPH McNALLY (Cal. SBN: 250289)
Assistant United States Attorneys
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-3358
     Facsimile:  (213) 894-3713
     Email:  Martin.Estrada@usdoj.gov
             Joseph.McNally@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | No. SA CR 09-248(B)-DOC |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION RE: PRE-SENTENCE REPORT AND SENTENCING OF ARMAN SHAROPETROSIAN (#1); EXHIBIT |
| v. | |
| ARMAN SHAROPETROSIAN, *et al.*, | |
| Defendants. | |

     Plaintiff, by and through its attorney of record, the United States Attorney for the Central District of California, hereby files its position regarding the Presentence Report ("PSR") submitted by the United States Probation Office for defendant ARMAN SHAROPETROSIAN ("defendant").

///

///

1

1        The government's sentencing position is based on the attached

2   memorandum of points and authorities, the PSR, attached exhibit, the

3   records and files of this case, and any argument that the Court may

4   request at the sentencing hearing.   The government respectfully

5   requests the opportunity to supplement its position as may become

6   necessary.

7   Dated: November 26, 2012        Respectfully submitted,

8                                  ANDRÉ BIROTTE JR.
                               United States Attorney

9

10                                 ROBERT E. DUGDALE
                               Assistant United States Attorney

11                                 Chief, Criminal Division

12

13                                        /s/
                               E. MARTIN ESTRADA

14                                 JOSEPH McNALLY
                               Assistant United States Attorneys

15

16                                 Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**PAGE**

Table of Authorities ..............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION.................................................1

II.   FACTUAL BACKGROUND..........................................3

      A.    The Scheme to Defraud.................................3

      B.    Wiretap Employed on SHAROPETROSIAN's Telephones..........5

III.  THE GOVERNMENT'S SENTENCING RECOMMENDATION....................7

      A.    The Sentencing Guidelines Calculation....................8

            1.   Loss Amount......................................8

            2.   Victim Enhancement..............................10

            3.   Sophisticated Means.............................10

            4.   Use of Means of Identification....................12

            5.   Vulnerable Victim...............................13

            6.   Role Enhancement................................15

      B.    Acceptance of Responsibility...........................16

      C.    The S 3553(a) Factors.................................18

IV. Conclusion.....................................................21

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**                                                    **PAGE(S)**

3

<u>United States v. Booker</u>,
        543 U.S. 220 (2005)..........................................18

4

<u>United States v. Carty</u>,
        520 F.3d 984 (9th Cir. 2008)...........................18, 19

5

6

<u>United States v. Dare</u>,
        425 F.3d 634 (9th Cir. 2005)...............................7

7

<u>United States v. Hicks</u>,
        368 F.3d 801 (7th Cir. 2004)..............................16

8

<u>United States v. Ingham</u>,
        486 F.3d 1068 (9th Cir. 2007)...............................15

9

10

<u>United States v. Lambert</u>,
        498 F.3d 963 (9th Cir. 2007)..............................13

11

<u>United States v. Maldonado</u>,
        215 F.3d 1046 (9th Cir. 2000)...............................15

12

13

<u>United States v. Medrano</u>,
        241 F.3d 740 (9th Cir. 2001)..............................14

14

<u>United States v. Robinson</u>,
        538 F.3d 605 (7th Cir. 2008)..............................10

15

16

<u>United States v. Schneider</u>,
        429 F.3d 888 (9th Cir. 2005)..............................16

17

<u>United States v. Watts</u>,
        519 U.S. 148 (1997)....................................7, 10

18

19

<u>United States v. Wayland</u>,
        549 F.3d 526 (7th Cir. 2008)..............................10

20

<u>United States v. Williams</u>,
        441 F.3d 716 (9th Cir. 2006)..............................14

21

22

**FEDERAL STATUTES**

23

18 U.S.C. § 3553(a).........................................3

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

In the summer of 2009, while serving a ten-year state sentence for shooting at an occupied vehicle and carrying a concealed weapon, defendant ARMAN SHAROPETROSIAN ("SHAROPETROSIAN" or "defendant") led a wide-ranging conspiracy to steal the identities and bank accounts of hundreds of bank customers in order to cause millions of dollars in losses.  In carrying out the scheme from prison, SHAROPETROSIAN organized and led other conspirators in misappropriating the bank information and forging and depositing large-value bank checks. Defendants intentionally targeted older, innocent victims, who would be less likely to become aware that their identities were being compromised.  Fortunately, law enforcement officers, utilizing wiretaps, made every effort to stop the scheme through seizures and calls to the banks to freeze the accounts.  Yet, even after several seizures and freezes, SHAROPETROSIAN made clear that he would do everything he could to continue victimizing bank customers:  "I'm trying to fix the problem so we can make money . . . We're a *team*. We're going to make this work.  You get what I'm saying?  I don't care . . . give a damn how much it takes.  I been doing this shit for *ten years*."  (8/31/09 call, Trial Exhibit 80 (emphasis added).)

On March 16, 2012, following a trial, the Court convicted SHAROPETROSIAN of the following counts in the Second Superseding Indictment ("Indictment"): Count 1, Conspiracy to Commit Bank Fraud, in violation of Title 18, United States Code, Section 1349; Counts 24, 25, 30, 31, charging Bank Fraud, in violation of Title 18, United States Code, Section 1344; and Counts 51, 52, 54, 59, 66, 67, and 70, charging Aggravated Identity Theft, in violation of Title

18, United States Code, Section 1028A.  Co-defendants KAREN
MARKOSIAN ("MARKOSIAN"), KRISTINE OGANDZHANYAN ("OGANDZHANYAN"), and
ARTUSH MARGARYAN ("MARGARYAN") also went to trial and were
convicted.

    On June 19, 2012, the United States Probation Office ("USPO")
disclosed to the parties its Presentence Report ("PSR") in this
matter.  The USPO found that SHAROPETROSIAN was subject to a base
offense level of 7 under U.S.S.G. § 2B1.1(a)(1), an 18-level upward
adjustment for loss exceeding $2,500,000, but not more than
$7,000,000 under U.S.S.G. § 2B1.1(b)(1)(J), a 4-level upward
adjustment for 50 or more victims under U.S.S.G. § 2B1.1(b)(2)(B), a
2-level upward adjustment for sophisticated means under U.S.S.G. §
2B1.1(b)(10)(C), a 2-level upward adjustment for vulnerable-victim
under U.S.S.G. § 3A1.1(b)(1), and 4-level increase for being a
leader or organizer under U.S.S.G. 3B1.1(a).  See PSR ¶¶ 74-97.  The
USPO further determined that SHAROPETROSIAN's criminal history
category is category IV.  See PSR ¶¶ 126-27.  With a total offense
level of 37 and a category IV criminal history, the resulting
Sentencing Guidelines range of imprisonment for Counts 1, 24, 25,
30, and 31 is 292 to 365 months incarceration.  See PSR ¶ 171.
Further, the USPO noted that SHAROPETROSIAN was subject to at least
one 24-month consecutive sentence for Counts 51, 52, 54, 59, 66, 67,
and 70, charging him with Aggravated Identity Theft, in violation of
Title 18, United States Code, Section 1028A.  See PSR ¶¶ 72, 137.
Based on these calculations, the USPO recommends a sentence of 316
months imprisonment (292 months for Counts 1, 24, 25, 30, and 31;
plus 24 months on Counts 51, 52, 54, 59, 66, 67, and 70), to be
followed by five-years supervised release.

2

Although the government agrees with the bulk of the facts and calculations set forth in the PSR, the government believes that a 2-level upward adjustment for use of a means of identification to produce another means of identification, <u>see</u> U.S.S.G. § 2B1.1(b)(11)(C)(i), also applies here. With this adjustment, SHAROPETROSIAN's total offense level is 39, resulting in a range of imprisonment of 360 to life for Counts 1, 24, 25, 30, and 31. Further, in light of the widespread nature of the scheme, and the callousness of SHAROPETROSIAN's crimes, the government believes that at least two of SHAROPETROSIAN's Aggravated Identity Theft convictions should be ordered to run consecutively.

Accordingly, under the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government recommends that SHAROPETROSIAN be sentenced to 408 months imprisonment (360 months for Counts 1, 24, 25, 30, and 31; plus 24 months on Counts 51, 52, 54, 66, 67, and 70, and 24 months on Count 59), followed by five-years supervised release, and a mandatory special assessment of $1,200.

**II. FACTUAL BACKGROUND**

The evidence at trial showed the following:

**A.   The Scheme to Defraud**

Beginning on an unknown date, but at least as early as 2005, defendants executed a sophisticated bank fraud scheme throughout Southern California, primarily in Los Angeles and Orange Counties. The scheme targeted individual victim bank accounts (the "victim-accounts") and involved obtaining confidential account information followed by the cashing of fraudulent checks against the victim-

3

account.   Over the approximate six-year duration of the fraudulent scheme, defendants conspired to cause millions of dollars in losses.

Although the scheme varied slightly with each victim-account, defendants and their co-conspirators followed the same general sequence of steps:

(1)   Defendants would obtain confidential bank account information for a victim-account, typically by bribing employees working at the target banks.  In doing so, defendants targeted high-value bank accounts and requested customer profile information, which included the account information and the corresponding personal identifying information for the victim-account owners.

(2)   After obtaining information for the victim-account, defendants and other co-conspirators would call the customer service line at the target bank and pose as the victim-account owner to obtain bank account information and/or order bank checks.  During some of these calls, defendants and other co-schemers would also make changes to the victim-account information, such as transferring funds in between accounts or changing the telephone numbers or addresses associated with the account.

(3)   After placing an unauthorized check order for a victim-account, defendants and their co-conspirators would steal the checks from the victims' addresses, or change the victims' address so that the checkbook would simply get delivered to an address controlled by defendants or a co-conspirator.

(4)   In addition to ordering checks for a victim-account, defendants would obtain a copy of the victims' signatures.  In some instances, defendants would obtain an image of a victim-account owner's signature from bank insiders; in other cases, defendants

4

used the victim-account owner's personal identifying information to obtain public record documents bearing the victim-account owner's signature (i.e., property deeds).

(5)  After obtaining the checkbooks, defendants would prepare fraudulent checks.  By using information obtained when calling customer service regarding recent transactions, defendants could make certain that the number for the fraudulent check followed the number for the most recent check written for the victim-account. Defendants would forge the victim-account owners' signature on the fraudulent check.

(6)  Defendants then deposited the checks into accounts they controlled to launder the criminal proceeds.  In some instances, the bank would attempt to verify the check by calling a number associated with the victim-account.  To avoid alerting the bank of the fraud, defendants would either (1) ensure that the number associated with the account was a fictitious number, (2) change the number associated with the victim-account to a telephone number controlled by defendants, or (3) constantly call the victim account owner's true telephone at the time the fraudulent check was being cashed to cause a busy signal.

**B.  Wiretap Employed on SHAROPETROSIAN's Telephones**

During the course of a related investigation into Armenian organized crime groups (United States v. Darbinyan, et al., CR 11-72(A)-DDP), agents obtained a court-authorized wiretap on telephones being used by SHAROPETROSIAN.  Wire interception took place from July 2009 to September 2009.  Although he was incarcerated at the time, SHAROPETROSIAN had obtained smuggled cellular telephones to communicate with criminal associates outside of the jail without

5

being monitored.  The calls intercepted over the wiretap on two

telephones used by SHAROPETROSIAN establish, among other things,

that SHAROPETROSIAN and another inmate, co-defendant Angus Brown

("Brown"), were working together to execute the above-described bank

fraud scheme.  The intercepted calls show that BROWN and

SHAROPETROSIAN, would communicate with co-conspirators, including

co-defendants MARKOSIAN, OGANDZHANYAN, LEWELLYN COX ("COX"), KELLY

BENSON ("BENSON"), DAMIAN WADSACK ("WADSACK"), OGANES TANGABAKYAN

("TANGABAKYAN"), VERGINE GASPARIAN ("GASPARIAN"), and FAYE BELL

("BELL"), regarding aspects of the fraud scheme.  In particular,

defendants were intercepted exchanging victim's personal identifying

information, calling banks for information, ordering checks for

victim-accounts, and instructing co-conspirators on how to prepare

fraudulent checks. In addition, over several intercepted calls,

defendants discussed working together and sharing the proceeds of

the fraud amongst the various participants of the scheme.

In addition to intercepting criminal conversations, agents

conducted surveillance and did searches in support of the wiretap.

For instance, on August 6, 2009, co-defendants MARGARYAN and

HOVHANNES DILBOYAN ("DILBOYAN") were arrested by officers of the

Burbank Police Department ("BPD") following a traffic stop during

which officers found a fraudulent check for $44,730.17 in the name

of one of the scheme's victims, victim J.L.  They had been seen

receiving the check from OGANDZHANYAN just prior to their arrest.

Incident to his arrest, officers searched DILBOYAN, and inside

DILBOYAN's pocket, officers found a thumb drive.  Pursuant to a

search warrant, the thumb drive was later searched and found to

contain, among other things, over 1,000 debit card numbers, bank

account numbers, and credit card numbers in the names of other
people.

Further, in February 2011, agents arrested defendants and
searched the residences of, among others, OGANDZHANYAN and
MARGARYAN's residences.  Among the evidence recovered pursuant to
the search warrants at the various locations were images of customer
profile information, photographs of defendants forging signatures on
checks, documents containing victims' personal identifying
information, images of fraudulent checks, and victim-account
numbers.

**III. <u>THE GOVERNMENT'S SENTENCING RECOMMENDATION</u>**

In determining facts for sentencing, courts apply a
preponderance standard, absent extreme circumstances, in which case
a clear-and-convincing standard applies.  <u>See</u> <u>United States v. Dare</u>,
425 F.3d 634, 642 (9th Cir. 2005).  Indeed, the Supreme Court has
held that a court may consider even acquitted conduct in its
sentencing calculations if it finds that the government has proved
the conduct by a preponderance of the evidence.  <u>United States v.</u>
<u>Watts</u>, 519 U.S. 148, 157 (1997) (per curiam).  Under a preponderance
of the evidence standard, or even a clear-and-convincing standard,
the USPO's factual findings and Sentencing Guidelines enhancements
are fully supported by the evidence in this case.  In addition,
SHAROPETROSIAN is subject to an additional 2-level upward adjustment
for use of a means of identification to obtain another means of
identification under U.S.S.G. § 2B1.1(b)(11)(C)(i).

SHAROPETROSIAN's total offense level, therefore, is 39, and,
with a criminal history category of IV, his recommended range of
imprisonment is 360 to life months for Counts 1, 24, 25, 30, and 31.

7

1    **A.    The Sentencing Guidelines Calculation**

2          The base offense level for Counts 1, 24, 25, 30, and 31 is 7

3    under U.S.S.G. § 2B1.1(a)(1).

4          1.    Loss Amount

5          In terms of calculating loss amount, SHAROPETROSIAN is

6    responsible for all reasonably foreseeable acts and omissions of

7    others in furtherance of the jointly undertaken conspiracy, and all

8    acts that were part of the same course of conduct or common scheme

9    or plan as the conspiracy.  See U.S.S.G. § 1B1.3(a)(1)(B), (a)(2).

10   In light of these standards, the USPO held SHAROPETROSIAN

11   accountable for all relevant conduct that occurred between July 1,

12   2009 and April 18, 2010, when SHAROPETROSIAN left Avenal State

13   Prison.  See PSR ¶ 78.  These calculations result in a total of

14   $1,565,576.33 that was fraudulently obtained from victim bank

15   accounts, and another $3,247,445.98 that conspirators attempted to

16   obtain, for a total of $4,813,022.31 of actual and intended loss –

17   comfortably within the range of an 18-level upward adjustment for

18   loss amount exceeding $2,500,000 under U.S.S.G. § 2B1.1(b)(1)(J).

19   See PSR ¶ 81; see also Declaration of James Mikkelson; Loss

20   Calculation Spreadsheet (filed under seal as Ex. A to Gov't's

21   Position Re Defendant Angus Brown and incorporated by reference).

22         SHAROPETROSIAN claims that the Court should look only at the

23   specific victims he referenced in wiretap calls because he was not

24   "responsible" for BROWN's criminal conduct.  See PSR ¶ 73.  This

25   claim is meritless.  Although SHAROPETROSIAN now seeks to divorce

26   himself from the fraud committed by BROWN and his other co-

27   conspirators, the evidence shows that he was fully immersed in their

28   criminal conduct, and that the losses they caused were therefore

8

foreseeable to him.  In one call, SHAROPETROSIAN told his mother, GASPARIAN, with reference to BROWN, "It is the black guy that works with me . . . The books they bring home . . . The books . . . He is the one.  We work **together** from here." (8/30/09 call, Trial Exhibit 93 (emphasis added).)  Further, in a joint call with BROWN, SHAROPETROSIAN told WADSACK, "We're working together . . . We're a team.  We're going to make this work . . . . I been doing this shit for ten years." (8/31/09 call, Trial Exhibit 80.)

What is more, even if the Court were to consider only the victims and accounts referenced and victimized by the trial defendants – SHAROPETROSIAN, MARKOSIAN, OGANDZHANYAN, and MARGARYAN – and BROWN, those approximately twenty-one accounts result in an intended loss of approximately $2,660,076.77, as those were the values of the accounts at the time defendants attempted to victimize them.  See Chart Re: Referenced Victims, attached as Exhibit 1.  Although law enforcement, through the wiretap and good police work, thwarted most of defendants' efforts to harm the victims, defendants intended to fully drain the accounts.

In one call, BROWN referenced a victim who had approximately $400,000 in combined accounts, and stated, "We're gonna get 400 before they even know it's gone . . . we're gonna try and do like . . . four big ones the first day." (8/5/09 call, Trial Exhibit 40.) Further, when discussing stealing from victim J.L., SHAROPETROSIAN told MARKOSIAN that the account had approximately "134" ($134,000), with regard to preparing the fraudulent checks, "I'm writing one for 48 . . . I'm writing another one for 53.  And I'm writing another one for the rest.  I'm giving you three pieces.  Take care of one of them today.  You'll withdraw that one tomorrow.  Tomorrow you'll

deposit the other one and the third one you'll do the day after."
(8/9/09 call, Trial Exhibit 46.)

Therefore, an 18-level upward adjustment for loss amount exceeding $2,500,000, but not more than $7,000,000, applies here under U.S.S.G. § 2B1.1(b)(1)(J).

### 2.   Victim Enhancement

Likewise, between July 1, 2009 and April 18, 2010 the scheme resulted in 114 individuals whose means of identification were compromised through the scheme.  See PSR ¶¶ 79, 83  As such, SHAROPETROSIAN is also subject to a 4-level upward adjustment for 50 or more victims under U.S.S.G. § 2B1.1(b)(2)(B).

### 3.   Sophisticated Means

An enhancement under Section 2B1.1(b)(10)(C) for "sophisticated means" applies to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  See U.S.S.G. § 2B1.1, cmt. 8(B).  As an example of sophistication, the Sentencing Guidelines state that "in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means."  Id.

Courts have held that "[o]ffense conduct is sophisticated if it displays 'a greater level of planning or concealment'" than a typical fraud scheme.  See United States v. Wayland, 549 F.3d 526, 528 (7th Cir. 2008) (quoting United States v. Robinson, 538 F.3d 605, 607 (7th Cir. 2008)).  For instance, the Ninth Circuit applied the "sophisticated means" enhancement in United States v. Egu, 379

1  Fed. Appx. 605 (9th Cir. 2010),[1] when it held that a "sophisticated

2  means" enhancement was properly included where the defendant

3  "fraudulently opened new credit accounts using the victims' personal

4  identifiers . . . had fraudulently-purchased goods delivered to

5  upscale, vacant homes in order to avoid detection; and made bursts

6  of purchases on new credit accounts before creditors shut the

7  accounts down."  Id. at 607.  Further, the court held that "the

8  district court properly considered the number of victims" in

9  applying the "sophisticated means" enhancement, "because the use of

10  multiple victims to obtain multiple cards was a sign of

11  sophistication."  Id.

12      Here, the scheme that SHAROPETROSIAN was involved in was

13  "complex" or "especially intricate" in its execution and

14  concealment.  Defendants compartmentalized the scheme into numerous

15  components to avoid detection:  different conspirators would obtain

16  victim account information from bank insiders, call bank customer

17  service lines to obtain information and order checks, steal the

18  checks from victims' homes, forge and prepare the checks, and go to

19  banks to cash and deposit the checks.  Indeed, defendants went so

20  far as to use public records (i.e., deeds of trust) to obtain

21  victims' signatures.

22      In addition, defendants used complex and intricate means to

23  conceal the proceeds of their illegal activities.  Defendants used

24  _____

25      [1]  Pursuant to Federal Rule of Appellate Procedure 32.1, "a
26  court may not prohibit or restrict the citation of federal judicial
   opinions" that have been designated unpublished but "issued on or
   after January 1, 2007."  Fed. R. App. P. 32.1(a).  Under Ninth
27  Circuit Rule 36-3, unpublished dispositions "issued on or after
   January 1, 2007 may be cited to the courts of this circuit in
28  accordance with FRAP 32.1."

11

accounts they controlled (often through identities they had stolen
or purchased) to launder proceeds of bank fraud and thereby conceal
their activities and avoid detection.  Many of these accounts were
fictitious entities and businesses that did not actually exist.  <u>See</u>
U.S.S.G. § 2B1.1, note 8(B).  SHAROPETROSIAN confirmed these means
in intercepted telephone calls.  In one call, SHAROPETROSIAN told
WADSACK, "All these things that I'm using it is our people that
[are] going back to my country.  You get what I'm saying? . . . I
wash them so we can do it at the end all day.  I'm in the medical
business.  You get what I'm saying?"  (8/31/09 call, Trial Exhibit
80.)   Then, BROWN took the telephone and further explained, "You
see how . . . I told you he filters the account? . . . He ships
people out of the country, so we don't have to deal with the
alphabet [law enforcement]."  (<u>Id.</u>)

     For instance, with regard to the fraudulent check for
$44,730.17 from victim J.L. that was seized from MARGARYAN and
DILBOYAN, defendants made the fraudulent check in the name of "Gagik
Karapetyan."  Officers also found, inside MARGARYAN's pocket, a
blank check for a bank account for the fictitious business Varaz
Apparel.  Review of the bank records showed that the fictitious
account was one of many money laundering accounts being used by
defendants to receive and launder proceeds of bank fraud, including
fraudulent checks in the name of "Gagik Karapetyan."  (Trial Exhibit
132.)  Defendants used and referenced various such laundering
accounts.

     The facts clearly show that SHAROPETROSIAN is subject to a two-
level enhancement for "sophisticated means" under Section
2B1.1(b)(10)(C).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

####           4.   Use of Means of Identification

     A 2-level upward adjustment for use of a means of
identification to obtain another means of identification under
U.S.S.G. § 2B1.1(b)(11)(C)(i) also applies here.  The Ninth Circuit
has instructed that "[t]he Guidelines, including enhancements, are
ordinarily applied in light of available commentary, including
application notes."  United States v. Lambert, 498 F.3d 963, 966
(9th Cir. 2007).  The application notes for Section
2B1.1(b)(11)(C)(i) state that the enhancement applies "in a case in
which a means of identification other than the defendant . . . is
used without that individual's authorization unlawfully to produce
or obtain another means of identification."  See U.S.S.G. § 2B1.1,
n.9(C).  As examples, the application notes state that the
enhancement applies where a "defendant obtains an individual's name
and social security number from a source . . . and obtains a bank
loan in that individual's name," and where a "defendant obtains an
individual's name and address from a source . . . and applies for,
obtains, and subsequently uses a credit card in that individual's
name."  Id.; see United States v. Gutierrez, 453 Fed. Appx. 705, 706
(9th Cir. 2011) (applying 2-level enhancement for use of a means of
identification to obtain another means of identification where
defendant used "a customer's signature to obtain a loan for his own
benefit").

     Here, defendants' unlawfully obtained victims' means of
identification, including names, account numbers, social security
numbers, and dates of birth, and used them to obtain another means
of identification, namely, bank checks in those victims' names.
SHAROPETROSIAN's conduct falls squarely within the examples set

1    forth in Section 2B1.1(b)(11)(C)(i)'s application notes.

2    Accordingly, the 2-level enhancement under Section

3    2B1.1(b)(11)(C)(i) applies.

4            5.   Vulnerable Victim

5        A 2-level increase applies if "the defendant knew or should

6    have known that a victim of the offense was a vulnerable victim."

7    See U.S.S.G. § 3A1.1(b)(1).  "Vulnerable victim" is defined as "a

8    person (A) who is a victim of the offense of conviction and any

9    conduct for which the defendant is accountable under § 1B1.3

10   (Relevant Conduct); and (B) who is unusually vulnerable due to age,

11   physical or mental condition, or who is otherwise particularly

12   susceptible to the criminal conduct."  See U.S.S.G. § 3A1.1, cmt.

13   n.2.  A vulnerable victim need not be the technical victim of the

14   convicted offense, and need only suffer harm or significant

15   inconvenience from the defendant's conduct.  See United States v.

16   Medrano, 241 F.3d 740, 745 n.4 (9th Cir. 2001).  Courts routinely

17   apply the "vulnerable victim" enhancement to fraud targeting elderly

18   victims.  See United States v. Williams, 441 F.3d 716, 725-26 (9th

19   Cir. 2006) (finding).

20       Here, SHAROPETROSIAN's fraud and identity theft targeted

21   vulnerable victims: elderly individuals.  This was not by accident

22   but by design – the defendants' express purpose was to target bank

23   customers with large value accounts who were not proficient in

24   checking up on their accounts via the internet.  Defendant BROWN, in

25   discussing victim J.B., stated in one call, "You know, he was born

26   in the late, late, late 1920s so we're going to be able to knock his

27   head in . . . because he don't have anything, no internet . . . none

28   of that shit."  (See (8/14/09 call, Trial Exhibit 95.)  Earlier,

1   BROWN had told another conspirator, "One of them dudes is born in
2   1926 . . . Do you know how old that is? . . . So we going to be able
3   to clean his crop. Don't even trip . . . The older they are, the
4   less they got internet. Feel me? . . . When they that age, ain't no
5   internet, so we can just take it and take over." (See 8/13/09 call,
6   Trial Exhibit 113.)

7        SHAROPETROSIAN was fully aware of the conspiracy's objective of
8   targeting older victims.  In one call, while discussing with another
9   conspirator the need to misappropriate more bank customer
10  information, SHAROPETROSIAN stated, "Let me ask you something.  Tell
11  him to try to let go of Asians and bring other people, and bring
12  older people." (8/20/09 call, Trial Exhibit 73.)  Accordingly, a
13  vulnerable victim enhancement is warranted here.

14              6.   Role Enhancement

15       Under U.S.S.G. § 3B1.1(a), a 4-level increase applies where a
16  SHAROPETROSIAN is "an organizer or leader of criminal activity that
17  involved five or more participants or was otherwise extensive."  A
18  court may impose this enhancement if there is "evidence that the
19  defendant exercised some control over others involved in the
20  commission of the offense or was responsible for organizing others
21  for the purpose of carrying out the crime." United States v.
22  Ingham, 486 F.3d 1068, 1074 (9th Cir. 2007); see also United States
23  v. Pena, 380 Fed. Appx. 623, 626 (9th Cir. 2010) (holding that
24  "organizer-leader" enhancement applied to a mail fraud defendant who
25  enlisted and supervised four other individuals in a scheme).  "A
26  single incident of persons acting under a defendant's direction is
27  sufficient evidence to support" a role enhancement.  United States
28  v. Maldonado, 215 F.3d 1046, 1050 (9th Cir. 2000).

Here, the evidence unequivocally showed that SHAROPETROSIAN was responsible for organizing and coordinating the scheme from prison, and that he exercised control over others.  Indeed, in the intercepted wiretap calls, SHAROPETROSIAN repeatedly directed MARKOSIAN, OGANDZHANYAN, GASPARIAN, TANGABAKYAN, and others to obtain victim information, deliver checks, forge checks, and deposit checks.  Thus, a role enhancement is warranted.

**B.   <u>Acceptance of Responsibility</u>**

Despite the fact that he took his case to trial, put the government to its burden in all aspects of the case, and conceded no elements of the offense at trial, SHAROPETROSIAN seeks some form of credit for acceptance of responsibility.  (Def. Position Paper at 4-5.)  No such credit should be permitted here.

In order to receive a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1, "a defendant must truthfully admit the conduct comprising the offense and manifest adequate contrition for his or her actions in a timely manner."  <u>United States v. Schneider</u>, 429 F.3d 888, 892 (9th Cir. 2005) (emphasis added).  When a defendant goes to trial, the adjustment is given only "[i]n rare situations" when a defendant nonetheless clearly demonstrates acceptance of responsibility.  <u>See</u> U.S.S.G. § 3E1.1, n.2.  In <u>United States v. Hicks</u>, 368 F.3d 801 (7th Cir. 2004), for instance, the Seventh Circuit held that in order to receive an acceptance-of-responsibility adjustment based on defendant's challenge at trial only to drug quantity, defendant "was obligated to make [his limited challenge to drug quantity] known ahead of time" so that "the government would not waste resources preparing to prosecute him for the crimes."  Id. at 808.

16

1    Here, despite SHAROPETROSIAN's after-the-fact assertions,

2    SHAROPETROSIAN never made known that he was going to trial only to

3    contest certain sentencing enhancements.  To the contrary,

4    SHAROPETROSIAN indicated to the Court, clearly and unequivocally,

5    that he wished to go to trial to contest all issues, including

6    guilt.  Further, any suggestion that SHAROPETROSIAN indicated

7    acceptance of responsibility by electing to proceed with a court-

8    trial, rather than a jury-trial, is specious.  The Court made clear

9    to defendants prior to the beginning of trial, that whether they

10   chose a court-trial or jury trial, they would receive every trial

11   right to which they were entitled, including the presumption of

12   innocence and placing the burden of proof on the government.  The

13   Court honored defendants' wishes and afforded them a fair and

14   complete trial.

15   What is more, even SHAROPETROSIAN's own statement to the USPO

16   demonstrates his continued refusal to accept responsibility.  In his

17   statement to the USPO, SHAROPETROSIAN, while claiming that he

18   accepted responsibility, nonetheless stated "I do not believe that I

19   should be held responsible for the crimes committed by Angus Brown

20   and the other individuals who were involved in the [bank] fraud long

21   before I ever came to Avenal."  See PSR ¶ 73.  Yet, the evidence

22   shows, contrary to SHAROPETROSIAN's claim, that he fully partnered

23   with BROWN in furthering and directing the conspiracy.  In a July

24   27, 2009 call to an unidentified conspirator, "Art LNU,"

25   SHAROPETROSIAN stated "We will work with them, with this group . . .

26   He is a black guy . . . He is serving time with me, bro.  He works

27   directly from here . . . He can bring the legitimate books, the

28

17

1   papers! . . . He orders and gets them, dear bro." (7/27/09 call,

2   Trial Exhibit 5.)

3        Accordingly, SHAROPETROSIAN merits no credit, either under the

4   Sentencing Guidelines or § 3553(a), for acceptance of

5   responsibility.

6   **C.   The § 3553(a) Factors**

7        A sentencing court must start with the sentence advised by the

8   Sentencing Guidelines. <u>United States v. Booker</u>, 543 U.S. 220, 264

9   (2005) ("The district courts, while not bound to apply the

10  Guidelines, must consult those Guidelines and take them into account

11  when sentencing."). The Ninth Circuit has held that the Sentencing

12  Guidelines sentence is a "starting point" to determine a reasonable

13  sentence and that a sentence under the Sentencing Guidelines will

14  usually be reasonable. <u>See</u> <u>United States v. Carty</u>, 520 F.3d 984,

15  994 (9th Cir. 2008) (en banc).

16       Here, the § 3553(a) factors favor the recommended sentence.

17  Section 3553(a)(1) requires the Court to consider the nature and

18  circumstances of the offense, and the history and characteristics of

19  the defendant. SHAROPETROSIAN's offense, which was both far

20  reaching and complex, was particularly egregious. Defendants stole

21  the identities and account information of hundreds of victims and

22  then sought to use that information to plunder the victims' life

23  savings. In carrying out the scheme, defendants expressly targeted

24  vulnerable victims – elderly individuals who would be less likely to

25  quickly become aware of the theft.

26       SHAROPETROSIAN seeks a lesser sentence because he claims that

27  his criminal conduct did not result "in any actual loss." (Def.

28  Position Paper at 6.) Apart from the fact that this is factually

18

incorrect, (see Chart at Exhibit A), SHAROPETROSIAN entirely misses the point.  The only reason defendants were unable to wipeout the victims' life savings was because officers were listening to his calls and thwarting his plot by freezing targeted accounts, seizing stolen checks, and arresting co-conspirators.

Nevertheless, even though officers had successfully stopped much of the fraud, SHAROPETROSIAN was determined to continue the scheme.  On August 31, 2009, after officers had seized numerous checks, arrested co-conspirators, and frozen dozens of accounts, SHAROPETROSIAN discussed with BROWN and WADSACK making greater efforts to make sure the scheme would generate criminal proceeds: "Listen to me, we're working together . . . I'm trying to fix the problem so we can make money . . . We're a *team*.  We're going to make this work.  You get what I'm saying?  I don't care . . . give a damn how much it takes." (8/31/09 call, Trial Exhibit 80 (emphasis added).)  SHAROPETROSIAN described the nature of the problem:  "We get the books in our hands . . . We get to the part where the deposit and this shit blows up in our faces, homes." (Id.) SHAROPETROSIAN made clear that he was committed to continuing the conspiracy:  "We'll just work it together.  I'll keep on communicating with you so we can do something good, okay? . . . We're *partners*." (Id. (emphasis added).)

Moreover, SHAROPETROSIAN's history and characteristics favor the recommended sentence.  SHAROPETROSIAN has a disturbing criminal history, involving numerous offenses involving assault, theft, and firearms.  See PSR ¶¶ 112-25.  SHAROPETROSIAN's convictions only tell part of the story.  They stem from his role as a leader of the Armenian Power criminal enterprise.  For instance, his 2003

19

convictions for shooting at occupied vehicle, carrying a concealed firearm, and assault with a firearms, were from consolidated cases that occurred in 2001 and 2002.  Further, they were pled down from attempted murder with a gang enhancement, in which he and another Armenian Power member were involved in drive-by shootings.  See PSR ¶¶ 117-20.

It was while serving his ten-year sentence for the drive-by shootings that SHAROPETROSIAN engaged in the bank fraud and identity theft conspiracy.  What is more, SHAROPETROSIAN himself admitted during the investigation that the convictions he had sustained were only the tip of the iceberg with regard to his criminal conduct: Speaking with WADSACK about the bank fraud scheme, SHAROPETROSIAN said, "I been doing this shit for **ten years**."  (8/31/09 call, Trial Exhibit 80 (emphasis added).)

Further, Section 3553(a)(2), which requires the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of defendant, also favors the recommended sentence.  As can be seen from SHAROPETROSIAN's criminal history, numerous arrests and convictions have failed to cause him to cease his criminal activity.  In fact, the instant offenses were committed while SHAROPETROSIAN was incarcerated in a state prison facility serving a 10-year sentence.  Therefore, a much lengthier sentence is needed here to promote respect for the law and protect the public from SHAROPETROSIAN.

///

///

20

## IV.   <u>CONCLUSION</u>

Accordingly, under the Sentencing Guidelines and § 3553(a), the government recommends that SHAROPETROSIAN be sentenced to 408 months imprisonment (360 months for Counts 1, 24, 25, 30, and 31; plus 24 months on Counts 51, 52, 54, 66, 67, and 70, and 24 months on Count 59), followed by five-years supervised release, and a mandatory special assessment of $1,200.